UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

IBEW Local 98 Pension Fund, Marian Haynes, and Rene LeBlanc, individually and on behalf of all others similarly situated,

      Plaintiffs,

v.

Best Buy Co., Inc.; Brian J. Dunn; Jim Muehlbauer; and Mike Vitelli,

      Defendants.

Civil No. 11-429 (DWF/FLN)

**MEMORANDUM
OPINION AND ORDER**

---

Clayton D. Halunen, Esq., and Shawn J. Wanta, Esq., Halunen & Associates; Daniel J. Pfefferbaum, Esq., and Shawn A. Williams, Esq., Robbins Geller Rudman & Dowd LLP; and Vernon J. Vander Weide, Esq., Lockridge Grindal Nauen PLLP, counsel for Plaintiffs IBEW Local 98 Pension Fund and Marion Haynes, Lead Plaintiff.

Clayton D. Halunen, Esq., and Shawn J. Wanta, Esq., Halunen & Associates; D. Seamus Kaskela, Esq., and David M. Promisloff, Esq., Barroway Topaz Kessler Meltzer & Check, LLP; and Garrett D. Blanchfield, Jr., Esq., Reinhardt Wendorf & Blanchfield, counsel for Plaintiff Rene LeBlanc, individually and on behalf of all others similarly situated.

Amelia N. Jadoo, Esq., David W. Beehler, Esq., Michael V. Ciresi, Esq., and Sara A. Poulos, Esq., Robins Kaplan Miller & Ciresi LLP, counsel for Defendants

---

**INTRODUCTION**

  This matter is before the Court on Defendants' Motion to Dismiss Plaintiffs' Amended Complaint (Doc. No. 27). For the reasons set forth below, the Court grants the motion.

## BACKGROUND

Defendant Best Buy Co., Inc. ("Best Buy" or the "Company") is a leading retailer of consumer electronics in the United States, headquartered in Richfield, Minnesota. (Am. Compl. ¶ 2.) This action is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of Best Buy between the dates of September 14, 2010 and December 13, 2010 (the "Class Period"), against Defendants Best Buy and Brian J. Dunn ("Dunn"), "Jim Muehlbauer ("Muehlbauer"), and Mike Vitelli ("Vitelli"), officers and/or directors of Best Buy, for violations of the Securities Exchange Act of 1934 ("SEC Act"), 15 U.S.C. § 78a, *et seq.* (Am. Compl. ¶ 1.)

Lead Plaintiff Marion Haynes ("Haynes") purchased Best Buy stock during the Class Period. (*Id.* ¶ 20.) Haynes was appointed Lead Plaintiff in this litigation by the Court's Order of June 7, 2011. (Doc. No. 18.) Plaintiff IBEW Local 98 Pension Fund ("IBEW") purchased or acquired Best Buy common stock as well. (Am. Compl. ¶ 21.) Defendant Dunn is CEO of Best Buy, Defendant Muehlbauer is the Executive Vice President, and Defendant Vitelli is Enterprise Executive Vice President and President, of Best Buy for the Americas. (*Id.* ¶¶ 23–25.)

On March 25, 2010, Best Buy reported unexpectedly positive fiscal year 2010 ("FY10") financial results and issued aggressive fiscal year 2011 ("FY11") revenue

guidance: revenues of $52 to $53 billion, same store sales growth of 1% to 3%,[1] and earnings per share ("EPS") of $3.45 to $3.60. (*Id.* ¶¶ 3, 35–38.) At that time, Best Buy stated that it would engage in share repurchases during FY11, but insisted that its EPS forecast was independent of the impact of share repurchases. (*Id.* ¶ 3.) Investors were encouraged by Best Buy's FY10 financial results and Defendants' forecast for FY11; the Company's stock price increased from $41.18 on March 24, 2010 to $42.66 on March 25, 2010. (*Id.*) However, first quarter 2011 ("1Q11") results did not live up to Wall Street expectations: same store sales growth was lower than projected, and sales in gaming, music, movies, and televisions declined. (*Id.* ¶¶ 4, 45, 46.) Selling, General & Administrative Expenses ("SG&A") increased 12% year-over-year, and inventories increased 10% year-over-year. (*Id.*) Notwithstanding these disappointing first quarter results, Best Buy reiterated all aspects of its FY11 forecasts in its 1Q11 press release and later investor conference call. (*Id.* ¶¶ 46, 47.) During the Company's June 15, 2010 press release, it stated that market share growth was continuing and assured investors that the remainder of FY11 would be more profitable—in particular, in the fourth quarter. (*Id.*) When pressed by analysts on the conference call about how the Company would make up for disappointing results in 1Q11, Defendants dismissed the 1Q11 results as "just 10% of our year," and said "we have significant opportunity to make it up in Q2, Q3, and especially Q4." (*Id.* ¶¶ 5, 51.) Defendants explained that they would manipulate

---

[1] "Same store sales" is a measure of revenue at stores, call centers, and websites operating for at least fourteen full months as well as revenue related to other comparable store sales channels. (Am. Compl. at 1 n.1.)

3

certain "levers" to achieve the Company's forecast, including repurchasing outstanding shares. (*Id.* ¶¶ 30–32.) The Company repurchased $110 million in shares in 1Q11 and $600 million in 2Q11. (*Id.* ¶ 5.)

By September 2010, analysts were expecting a "cut in management guidance" due to weak television and computer sales industry-wide. (*Id.* ¶¶ 59–61; *see also* Doc. No. 25, Ex. 12 ("Oppenheimer Report").) On September 14, 2010, the first day of the Class Period, the Company reported a decline of 0.1% in comparable store sales growth, lower sales across home theater, entertainment hardware and software, decreased traffic in stores, and its first decline in market share in eighteen quarters. (Am. Compl. ¶ 6.) As a result, Defendants reduced the FY11 revenue forecast by $1 billion. (*Id.*) However, the Company announced a surprise $0.20 EPS increase over 2Q11 Wall Street EPS expectations, and increased EPS guidance to $3.55–$3.70. (*Id.*) Defendants attributed this increase to $700 million worth of share repurchases, despite previous representations that share repurchases would not impact the Company's forecasts. (*Id.*)

Despite the fact that the Company reduced its revenue forecast by $1 billion, Defendants Dunn, Muehlbauer, and Vitelli held a conference call on September 14, 2010, during which Defendant Muehlbauer stated that "our earnings are essentially in line with our original expectations for the year" and that "[o]verall, we are pleased that we are on track to deliver and exceed our annual EPS guidance." (*Id.* ¶¶ 65, 66.) When pressed by analysts on the conference call as to how "the revenue line specifically [could] accelerate to a pretty significant necessary extent" to make the EPS guidance projections, Defendants explained that "[w]e know during the holiday season that customers

over-index their wallet share into CE [consumer electronic] products . . . [and] [w]e have no reason to believe this holiday season is going to be any different." (*Id.* ¶ 70.) After the conference call, the Company's stock price increased from $34.65 on September 13, 2010 to $36.73 on September 14, 2010. (*Id.* ¶ 8.) By September 27, 2010, Best Buy stock was trading above $40 a share. (*Id.*)

Plaintiffs allege that by September 14, 2010, Defendants knew of multiple significant indicators that the Company was not in fact "on track" to achieve its FY11 targets, but was actually far off pace, and that they made statements concerning the Company's financial state that were knowingly false or made with no reasonable basis in fact. (*Id.* ¶ 9.) For example, Plaintiffs allege that Defendants knew that the 2Q11 EPS increase over Wall Street expectations was illusory and driven by manipulation of "levers" such as share repurchases, rather than substantive growth in sales, traffic, or margins. (*Id.* ¶ 11.) This, Plaintiffs claim, had the effect of reducing outstanding shares and artificially boosting EPS, while potentially masking a business slowdown. (*Id.* ¶¶ 132–35; *see also* Doc. No. 25, Ex. 2.) During the first three quarters of FY11, Defendants caused the Company to spend 7,050% of its free cash flow on share repurchases. (Am. Compl. ¶ 132.) In addition, Plaintiffs allege that Defendants knew: that comparable store sales missed street expectations in 1Q11 and turned negative in 2Q11; that store traffic had "been choppy"; that declines in comparable store sales were driven by a decline in customer traffic patterns; that the Company reported its first decline in market share in eighteen quarters on September 14, 2010; that sales in gaming and televisions were declining; that domestic inventory levels in categories such as

5

televisions were up; and that Defendants' top television vendors, Panasonic and Sony, publicly indicated that they no longer expected to make U.S. sales targets. (*Id.* ¶¶ 9, 10, 79, 86, 68, 88.) Despite all these known facts, Defendants reassured investors that earnings to date were "in line with . . . original expectations" and that the Company was "on track" to make its new increased FY11 guidance of $3.55 to $3.70. (*Id.* ¶¶ 7, 66.) One analyst, "Retail Geeks," at *Seeking Alpha* noted that same store sales would have to pass a 7% increase in 4Q11 to meet guidance, a level of quarterly growth not seen in years. (*Id.* ¶ 79; *see also* Doc. No. 25, Ex. 19.)

On November 24, 2010, two days before Black Friday, Defendant Vitelli stated that entry-level flat screen television sales were "going really strong." (Am. Compl. ¶ 13.) On Black Friday, Defendant Dunn stated that "anecdotally," the Company was "estimating about an 8 percent increase in our traffic year over year . . . . The crowds are terrific . . . people are absolutely spending money." (*Id.*) Plaintiffs allege that, in fact, Defendants had access to real-time in-store sales data and knew that sales were declining. (*Id.* ¶¶ 14, 33, 81.) The Company also chose not to compete promotionally on low-end televisions, despite earlier promises to investors that the Company would be highly promotional and deals would be "smoking hot." (*Id.* ¶ 14.) On and after November 26, 2010, the Company's stock continued to trade at levels above $42 per share. (*Id.* ¶ 13.)

On December 14, 2010, the Company reported 3Q11 EPS of just $0.54, falling short of 3Q11 estimates. (*Id.* ¶ 15.) The Company also reported a decline in comparable store sales of 5%, and a decline in market share of 110 basis points, with more losses to

come.  (*Id.*)  At that time, Defendants reduced FY11 EPS guidance to $3.20–$3.40, which was below its pre-Class Period level.  (*Id.* ¶¶ 105-07.)  The new guidance factored in an additional $0.12 of EPS to account for share repurchases the Company had made during FY11 to date, meaning that without the share repurchases, Defendants were expecting FY11 EPS as low as $3.08 per share.  (*Id.* ¶¶ 15, 107.)  Defendants did not wait for the results of 4Q11 holiday sales to reduce the EPS guidance.  (*Id.* ¶ 15.)

On a conference call on December 14, 2010 hosted by Defendants Dunn, Muehlbauer, and Vitelli, Defendants offered explanations for the earnings miss, claiming that it was a result of lower-than-expected sales in notebooks, gaming, and 3DTV.  (*Id.* ¶¶ 16, 104.)  Defendants also explained that they had failed to be "sufficiently promotional" in televisions.  (*Id.*)  Defendants admitted that their "top line growth assumptions earlier in the year turned out to be too aggressive based on the environment that we see for demand, specifically in the TV industry, and the computing industry overall."  (*Id.* ¶ 104; *see also* Ex. 29 at 3–5, 16.)

When Best Buy's true financial condition and revenue and earnings prospects for FY11 were revealed, investors sold off more than 64 million Best Buy shares.  (Am. Compl. ¶ 17.)  Best Buy stock suffered an immediate share price decline from $41.70 per share on December 13, 2010 to $35.52 per share on December 14, 2010, a 14% decline.  (*Id.* ¶¶ 17, 108.)

In this action, Plaintiffs argue that Defendants made false and misleading statements concerning the Company's financial status and revenue and earnings prospects for FY11, devising a scheme to deceive investors and the market about the Company's

7

true financial condition.  Plaintiffs assert that these false and misleading statements had the intended effect of, and caused Best Buy's stock to, trade at artificially inflated prices throughout the Class Period, reaching a high of $45.63 on November 23, 2010.  When Best Buy's stock plunged after the true state of its financial condition became known, Plaintiffs allege that Lead Plaintiff Haynes and other members of the class suffered considerable economic damages under the federal securities laws.

The Amended Complaint alleges the following counts against all Defendants: (1) violation of section 10(b) of the SEC Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5; and (2) violation of section 20(a) of the SEC Act, 15 U.S.C. § 78t.

## DISCUSSION

### I.   Legal Standard

#### A.   Motion to Dismiss

In deciding a motion to dismiss pursuant to Rule 12(b)(6), a court assumes all facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the complainant.  *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986).  In doing so, however, a court need not accept as true wholly conclusory allegations, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions drawn by the pleader from the facts alleged, *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990).  A court may consider the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint in deciding a motion to dismiss under Rule 12(b)(6).  *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007). Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555. As the United States Supreme Court recently reiterated, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," will not pass muster under *Twombly*. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 555). In sum, this standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]." *Twombly*, 550 U.S. at 556.

Defendants move to dismiss Plaintiffs' claims. Specifically, Defendants argue that Plaintiffs have failed to allege that Defendants made any untrue statements of material fact, and that their representations were either forward-looking statements accompanied by meaningful cautionary language, or are immaterial, vague puffery statements that cannot form the basis of liability under federal securities laws. Defendants also argue that Plaintiffs fail to plead with particularity facts giving rise to a strong inference of scienter on the part of Defendants. In addition, Defendants contend that Plaintiffs' section 20(a) derivative claim for control person liability must be dismissed because the underlying claims were not adequately pled under the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4. Defendants assert that Plaintiffs have had ample time to properly investigate their claims and to prepare their complaint, and thus, they argue that any request to amend should also be denied.

9

### B.     PSLRA

The PSLRA imposes a heightened pleading standard in cases alleging securities fraud. *Lustgraaf v. Behrens*, 619 F.3d 867, 873 (8th Cir. 2010). Under the PSLRA, complaints in a securities fraud action must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading," and must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" (the "scienter requirement"). 15 U.S.C. § 78u-4(b)(1), (2); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007). In considering a motion to dismiss, a court must accept all factual allegations in the complaint as true, and must consider the complaint in its entirety, evaluating whether all of the facts, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation in isolation meets that standard. *Tellabs, Inc.*, 551 U.S. at 322, 23. In deciding whether a plaintiff has alleged facts that give rise to a "strong inference" of scienter, a court must consider "plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable." *Id.* at 324. A complaint will survive only if a "reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

## II.   Defendants' Motion to Dismiss

### A.   Section 10(b) of the SEC Act and SEC Rule 10b-5

Plaintiffs allege that Defendants violated the anti-fraud provisions of section 10(b) of the SEC Act and SEC Rule 10b-5.  Section 10(b) of the SEC Act makes it "unlawful for any person, directly or indirectly . . . to use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of" SEC rules.  15 U.S.C. § 78j(b).  SEC Rule 10b-5 states that it is:

> unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce . . . [t]o employ any device, scheme, or artifice to defraud, [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5(a)-(c).  To bring an action under the antifraud provisions of section 10(b) and Rule 10b-5, a plaintiff must allege intent to deceive, manipulate, or defraud on the part of the defendant.  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 192 (1976).  Scienter may be established by facts demonstrating "a mental state embracing intent to deceive, manipulate, or defraud," by facts showing "severe recklessness," or with specific allegations of motive and opportunity.  *K-Tel Int'l Sec. Litig. v. K-Tel Int'l*, 300 F.3d 881, 893–94 (8th Cir. 2002).  Liability cannot be imposed for negligent conduct alone.  *Ernst & Ernst*, 425 U.S. at 201.

The PSLRA contains a "safe harbor" exception, which states that in any private action that is based on an untrue statement of material fact or omission of a material fact,

11

a defendant will not be liable for making a "forward-looking statement" that is: (1) "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement"; or (2) immaterial. 15 U.S.C. § 78u-5(c)(1)(A(i)-(ii).

In their Amended Complaint, Plaintiffs set forth numerous allegedly false and misleading statements made by Defendants. (Am. Compl. ¶¶ 62–72, 95–98.) Notwithstanding their lengthy assertions, it is very difficult to ascertain specifically which statements made by Defendants they allege to be false. The alleged misrepresentations that Plaintiffs cite in their Amended Complaint center on Best Buy's September 14, 2010 earnings forecast, and on statements made by Best Buy executives during the Thanksgiving shopping season, including Black Friday. Plaintiffs allege that, despite disappointing results in the first half of FY11, Defendants' increased earnings forecasts conveyed that Best Buy would experience "substantial and accelerated growth" in the latter half of FY11, which would permit it to achieve its EPS guidance. (*Id.* ¶ 63.) The most direct statement Plaintiffs allege to be misleading is Defendants' assurance to investors that notwithstanding disappointing sales figures and declining market share, the Company was "on track to deliver and exceed our annual EPS guidance" of $3.55-$3.70 per share, which was up to an 18% increase over FY 2009. (Doc. No. 25, Ex. 15 at 7; *see also* Am. Compl. ¶ 66.)

Plaintiffs also cite to statements regarding Defendants' projections for future months based on past trends, such as Defendants' statements that customer demand for

12

new products during the holiday season would drive increased revenue (Doc. No. 25, Ex. 15 at 17), and Defendants' opinion that back-to-school shopping was an "episodic" sales event that would drive customer traffic in the months ahead (*id.*, Ex. 11 at 9). Plaintiffs claim that as the Thanksgiving holiday approached, Defendants "increased the intensity of their statements concerning demand for their products[,] sending share prices even higher." (Am. Compl. ¶ 95.) In particular, Plaintiffs cite a Fox News interview with Defendant Vitelli and Neil Cavuto, in which Defendant Vitelli stated that customers were already lining up at Best Buy stores, and that television sales were "going really strong"; and an interview with Inside Track in which Defendant Dunn stated that based on the activity he had seen so far on November 26, 2010, "people are absolutely spending money. The registers have been going nonstop since we opened the doors." (Doc. No. 25, Exs. 24-25; Am. Compl. ¶¶ 95-96.)

Plaintiffs argue that Defendants' comments between November 24, 2010 and November 26, 2010 were knowingly false and misleading, and along with share buybacks, continued to fuel what they allege was Best Buy's artificially inflated stock price. (Am. Compl. ¶ 100.) Plaintiffs also argue that Defendants' December 14, 2010 statement that their previous growth assumptions had been "too aggressive" was evidence that their earlier statements were knowingly false when made. (*Id.* ¶¶ 104, 141; *see also* Doc. No. 25, Ex. 29 at 16.)

In support of their motion to dismiss, Defendants argue that Plaintiffs have cited no statements that were false when made, nor have they cited any facts giving rise to a strong inference of scienter. (Doc. No. 29 at 2, 3.) Defendants argue that any statements

13

made were either forward-looking statements accompanied by meaningful cautionary language, or are "immaterial vague puffery" that cannot form the basis for Defendants' liability under federal securities laws. (*Id.* at 2.)

The PSLRA's safe harbor provision provides that forward-looking statements cannot form the basis for liability if accompanied by meaningful cautionary statements. 15 U.S.C. § 78u-5(c)(1)-(2). Forward-looking statements include "projections of revenues, income (including income loss), earnings (including earnings loss) per share," "a statement of the plans and objectives of management for future operations," "a statement of future economic performance," and "any statement of the assumptions underlying or relating to" any of the statements described above. 15 U.S.C. § 78u-5(i)(1). Further, when forecasts, opinions, or projections are accompanied by meaningful cautionary statements, the "bespeaks caution" doctrine states that forward-looking statements may not form the basis of a securities fraud claim if those statements did not affect the "total mix" of information provided to investors. *Parnes v. Gateway 2000*, 122 F.3d 539, 548 (8th Cir. 1997) (citation omitted).

Plaintiffs argue that Defendants' statements are not subject to the protections of PSLRA safe harbor for forward-looking statements. They contend that the Company's September 14, 2010 statement that the Company was currently "on track to deliver and exceed our annual EPS guidance" was not a forward-looking statement subject to the protection of the PSLRA statutory safe harbor, but rather a statement of current fact reflecting upon the Company's performance up to that point in the fiscal year. (Am. Compl. ¶ 79.)

Best Buy's September 14, 2010 Form 8-K contained a cautionary statement that included forward-looking statements involving "a number of risks and uncertainties that could cause actual results to differ materially from the potential results discussed in the forward-looking statements." (Doc. No. 25, Ex. 13 at 5.)  This disclaimer enumerated several specific risks, including but not limited to "general economic conditions, changes in consumer preferences, credit market constraints . . . sales volumes, [and] pricing actions and promotional activities of competitors." (*Id.*)  Defendants' September 14, 2010 analyst conference call also began with a warning by Bill Seymour, Vice President of Investor Relations, about forward-looking statements.  Seymour reminded investors that comments made by him or other Best Buy representatives "may contain forward-looking statements, which are subject to risks and uncertainties," and encouraged investors to reference Best Buy's SEC filings for "additional information about factors that could cause actual results to differ from management's expectations." (*Id.*, Ex. 15, at 2.)  In addition, Best Buy's 10-K annual report contained a warning that the Company's future profitability could be materially adversely affected by risk factors that included Best Buy's ability to anticipate and respond to consumer preferences.  (*Id*, Ex. 7, at 15.)  The Court finds that these cautionary statements are sufficient to bring Defendants' statements under the safe harbor provision of the PSLRA.

With respect to statements made in December regarding Best Buy's Black Friday sales, the Court finds that these statements are not material under section 10(b) of the SEC Act.  Defendant Dunn's statements on November 26, 2010 concerned sales at *one* of Best Buy's stores, and were not intended as a blanket statement regarding the Company's

15

overall performance during the Thanksgiving season. (*Id*., Ex. 25, at 1.) Defendant Dunn makes clear that his statements are simply "anecdotal" reflections. (*Id.*) Similarly, Defendant Vitelli's November 24, 2010 interview was given before the Black Friday weekend, and is anecdotal in nature as well. (*Id*., Ex. 24.) Plaintiffs do not allege any facts to show that Defendant's Vitelli's statement that "people [are] actually lining up at the Best Buy stores around the country even now" was false. (*Id.*)

Upon review, the Court finds that when considered along with Defendants' cautionary statements, the alleged misrepresentations are simply forward-looking statements concerning Best-Buy's estimated future economic performance, and immaterial statements. Forward-looking statements of this nature and immaterial statements are not actionable under the SEC Act or related rules under the "bespeaks caution doctrine" and the "safe harbor" provision of the PSLRA. Accordingly, Defendants' statements do not support Plaintiffs' section 10(b) or Rule 10b-5 claims.

Further, Plaintiffs have failed to plead facts sufficient to show that Defendants had knowledge of any information that rendered their public statements false or misleading when they were made. Under the PSLRA, Plaintiffs must plead specific facts showing that Defendants "had access to, or knowledge of, information contradicting their public statements when they were made." *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 742 (8th Cir. 2002.) Plaintiffs have not alleged such facts, but rather make general assertions that Defendants, considering declines in store sales and traffic, could not possibly have reached their guidance forecasts, and that therefore, their statements must have been knowingly false. (Am. Compl. ¶¶ 79-81.) The fact that Defendants' predictions of future

growth turned out to be wrong, however, does not by itself render Defendants' projections fraudulent. *See NECA-IBEW Pension Fund v. Hutchinson Tech., Inc.*, 536 F.3d 952, 961 (8th Cir. 2008).

Further, as Defendants note, Best Buy publicly disclosed comparable store sales declines, a decline in customer traffic, a decline in television sales, and sales declines in comparable store sales of gaming and home theater. (Doc. No. 25, Ex. 15 at 3, 5, 6, Ex. 13 at 2, Ex. 8 at 2, Ex. 10 at 4.) This weakens Plaintiffs' argument that Defendants were devising a fraudulent scheme to artificially inflate market prices. The Court does not believe that "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged," as required to survive a Rule 12(b)(6) motion under the PSLRA. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

For the above reasons, the Court concludes that Plaintiffs have failed to plead facts that would establish that Defendants violated section 10(b) of the SEC Act and SEC Rule 10b-5. Accordingly, this claim is properly dismissed.

### B. Section 20(a) of the SEC Act

Plaintiffs argue that Defendants are liable under section 20(a) of the SEC Act, which establishes joint and several liability for "[e]very person who, directly or indirectly, controls any person liable" for violations of the securities laws, "unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t. Plaintiffs allege that the individual Defendants acted as controlling persons of Best Buy within the meaning of

section 20(a), and that, "by virtue of their positions and their power to control public statements about Best Buy," they had the power and ability to control the actions of Best Buy and its employees. (Am. Compl. ¶ 178.) Plaintiffs also argue that Best Buy controlled the individual Defendants and its other officers and employees. (*Id.*)

Under the PSLRA, in order to survive a motion to dismiss, a plaintiff must make a detailed showing of "particular facts" that allegedly demonstrate each individual defendant's role in a fraudulent scheme, and a court must disregard blanket assertions of fraud. *Kushner v. Beverly Enters.*, 317 F.3d 820, 827–28 (8th Cir. 2003). In their Amended Complaint, Plaintiffs fail to allege facts sufficient to demonstrate any individual Defendant's acts of fraud. In addition, Plaintiffs fail to allege facts to show that any individual Defendant possessed the necessary scienter requirement. The Amended Complaint does not allege insider trading or any "concrete and personal benefit" that would accrue to an individual Defendant as a result of a fraudulent scheme. *See K-Tel Int'l Sec. Litig.*, 300 F.3d at 894 ("[U]nsupported allegations with regard to motives generally possessed by all corporate directors and officers are insufficient as a matter of law.").

Regardless of the above deficiencies, Plaintiffs' section 20(a) claim fails because it is a derivative claim. To bring a claim under section 20(a) of the SEC Act, a plaintiff must first successfully allege an underlying violation. Because the Court holds that Plaintiffs' section 10(b) and Rule 10(b)-5 claims fail as a matter of law, the Court also dismisses Plaintiffs' section 20(a) claim for failure to state a claim.

For the reasons stated above, the Court concludes that Plaintiffs have not alleged a set of facts that entitle them to relief. Accordingly, Plaintiffs' Amended Complaint is properly dismissed.

### III. Request for Leave to Amend

In the event that the Court grants Defendants' Motion to Dismiss, Plaintiffs request leave to further amend their Amended Complaint. (Doc. No. 34 at 37.) Plaintiffs have submitted an 89-page Amended Complaint which took them five months to complete. Given the amount of time Plaintiffs took to complete their Amended Complaint, as well as the large number of amended allegations, the Court cannot envision a set of facts or circumstances wherein a second amended complaint could survive a motion to dismiss. Moreover, the Court does not believe that the interests of either party would be served by allowing Plaintiffs to file a second amended complaint. Plaintiffs' request for leave to amend their complaint is therefore respectfully denied.

### ORDER

Based upon the foregoing, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion to Dismiss Plaintiffs' Amended Complaint (Doc. No. [27]) is **GRANTED**.

2. Plaintiffs' Amended Complaint (Doc. No. [25]) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: March 20, 2012         s/Donovan W. Frank
                              DONOVAN W. FRANK
                              United States District Judge